## SCHOUWEILER v. UNITED STATES.

Circuit Court of Appeals, Ninth Circuit.
July 16, 1928.

No. 5410.

1. Conspiracy ⬅47—Evidence held to sustain conviction of conspiracy to smuggle intoxicating liquors into United States (Tariff Act 1922, § 593 [19 USCA § 496]).

Evidence *held* to sustain conviction of conspiracy to violate Tariff Act 1922, § 593 (19 USCA § 496), by smuggling contraband intoxicating liquors into United States, without paying taxes or conforming with other requirements of law.

2. Conspiracy ⬅43(12)—Evidence tending to show entire conspiracy of smuggling liquor, only part of which was charged in indictment, held admissible (Tariff Act 1922, § 593 [19 USCA § 496]).

In prosecution for conspiracy to smuggle intoxicating liquor into United States, in violation of Tariff Act 1922, § 593 (19 USCA § 496), where evidence tended to show that smuggling of 31 sacks of liquor charged in indictment was only an incident of a more comprehensive conspiracy, object of which was landing of entire cargo, and hence was integral part of larger enterprise, *held*, that evidence tending to prove whole scope of conspiracy, which also covered part specifically referred to in indictment, was admissible.

In Error to the District Court of the United States for the Southern Division of the Southern District of California; William P. James, Judge.

Marvin E. Schouweiler was convicted of conspiracy to smuggle intoxicating liquors, and he brings error. Affirmed.

See, also, 19 F.(2d) 387.

Samuel A. King and King & King, all of Salt Lake City, Utah, for plaintiff in error.

Samuel W. McNabb, U. S. Atty., and Donald Armstrong, Asst. U. S. Atty., both of Los Angeles, Cal.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

DIETRICH, Circuit Judge. The appellant and six others were convicted upon an indictment charging a conspiracy to violate section 593 of the Tariff Act of 1922, defining smuggling and kindred offenses (42 Stat. 982 [19 USCA § 496]). The indictment was returned August 31, 1927, and the period of the conspiracy is therein alleged to have been from May 1, 1926, up to that date. Its object, as averred, was to commit the offense of importing into the United States, near the city of San Diego, Cal., from some foreign country to the grand jurors unknown, with intent to defraud the revenues of the United States, 31 sacks, containing 12 quarts each, of contraband intoxicating liquor, without paying the taxes thereon or conforming with other requirements of the law. Seven overt acts are specified, two on June 4, one on June 5, two on June 23, one on July 1, and one during the period from July 20 to August 6, all in the year 1926.

[1] The principal assignment challenges the sufficiency of the evidence to support the verdict. It was shown that, during the period covered by the indictment and for some time prior thereto, two "rum boats," the

Clara French and the Marion Douglas, with large quantities of liquor on board, were lying about 60 miles off the coast from Los Angeles. The plan of the persons interested therein was from time to time, as there was opportunity, clandestinely to land in the United States portions of the liquor by means of smaller speed boats. One of these speed boats was the Jackie, owned by the defendant Dellan, with defendant Nicholles captain, and manned by the defendants Thompson, Fairbanks, and others. Nicholles, who was a witness for the government, testified that during the month of June, 1926, the Jackie brought in four loads of liquor; the first three being landed at the Venice Pleasure pier, and the last at San Diego. On this last trip, the Jackie, with 200 cases received from the Marion Douglas, was chased by a revenue cutter as she came into the harbor. Temporarily eluding the cutter, she was able to land 160 cases, and the other 40 were cast overboard. Of these 40 cases, divers from the cutter recovered 31, and these apparently constitute the liquor particularly referred to in the indictment. That there was a conspiracy, as alleged, the evidence leaves no doubt, and the question is of appellant's connection therewith. We therefore concern ourselves only with the evidence in so far as it bears upon that question.

Walker, the owner of and engineer on the Clara French, testified to his going, under engagement with one Detweiler, from Vancouver, where he resided, to the place where the Marion Douglas lay off the coast from Los Angeles. This was in March, 1926. When he reached the Marion Douglas there were on board several men, and he estimated she had a cargo of from 12,000 to 15,000 cases of liquor. He remained there until June, and received portions of the liquor from time to time for delivery to the speed boats. After the Clara French had been so operating for a considerable period, he, being advised so to do, sent a letter by a fish boat addressed to "Dr. Ross," at Los Angeles, and it turned out that "Dr. Ross" was Schouweiler. The letter was so worded that it would be meaningless to a stranger. After waiting a few days and receiving no answer, the witness went ashore for the purpose of seeing "Dr. Ross." He did not find him at an address in Los Angeles given to him by the captain of the Clara French, whereupon he went to San Diego to make inquiry, and there he got in touch with Schouweiler over the telephone, and told him where the Clara French was, that he had a load of liquor on board, and was short of supplies. By appointment he met Schouweiler soon thereafter, and in response to his request Schouweiler gave him $50 and took a list of supplies needed on the Clara French. This was in the presence of the defendant Thompson and others, and about June 4 Schouweiler, in the witness' presence, gave Thompson money, whereupon Thompson, accompanied by the witness, proceeded to various places for the purchase of the requisite supplies. During this visit the witness also conferred with Schouweiler, when he was with others of the defendants. When the witness started to return to the Clara French, he learned she had been seized by the Mexican government. He saw Schouweiler later, got more money from him, and was informed by him that he expected soon to have the Clara French free and the crew released. On one of these occasions Schouweiler appeared to be "sore," because he said "the stuff was not what it should be on the Marion Douglas"; that "there was a shortage of cargo he could not account for," and the witness told him where some of the liquor was.

Nicholles testified he knew Schouweiler, and had heard of him as "Dr. Ross." "In April, May, and June, 1926, I was employed on the boat Jackie by Schouweiler, which was used to haul liquor for him." First became acquainted with the Jackie about the middle of May, 1926, and while I was with her she brought in four loads. The fourth trip was June 22; got 200 cases from the Marion Douglas. The order came from Schouweiler; was present when ownership of liquor on the Marion Douglas was discussed; talked about it with Schouweiler and Murphy; discussed it on several occasions; the first was at Santa Barbara; they were discussing about dividing the cargo and money owed to Schouweiler by some of the owners of a previous trip, and the liquor was to be held until certain debts on a previous cargo were paid. Something was said about Schouweiler having charge of the cargo in the meantime; similar conversations at Schouweiler's house at a later time between Schouweiler, Murphy, and others. It was Murphy who employed witness to use the Jackie for these trips. Mr. Dellan came down and told him to make the last trip. The order for the liquor was in the same handwriting and in the same code as former orders. They were all in code. It was made out in Mr. Schouweiler's house, the same as the rest of them were.

On cross-examination he stated he got the liquor orders from Mr. Murphy and Mr. Dellan. On the last trip an extra man on the Jackie had the order, and he (the witness)

did not see it until they got to the Marion Douglas. He didn't know who the extra man was, and he didn't know whose order it was, but it was in the same handwriting as the other orders. Saw Schouweiler at the Venice pier on June 13 and June 20. He had no conversation with Schouweiler about the liquor on the last trip, and did not know to whom it belonged. He was not told where the extra man got the order, "but the handwriting and the code were the same as on the others." He further testified upon redirect examination that on June 14 Schouweiler came with him on the Jackie with a load of liquor from the Marion Douglas to the Venice pier; and that, while he never saw Schouweiler write an order for liquor, he did, at Schouweiler's house, see Mrs. Schouweiler write an order for 1,000 cases, and these cases were taken from the Marion Douglas and that was the writing with which he was familiar.

There was other circumstantial evidence, including an entry in a notebook in Schouweiler's handwriting, and testimony respecting the purchase of supplies which has been hereinbefore referred to, all tending in a measure to corroborate these witnesses. The testimony for the defendants can be regarded only as creating a conflict, and hence need not be reviewed. Upon the whole record we have no doubt that the evidence was ample to warrant submission to the jury.

[2] The other assignments involve different aspects of the one general contention that, inasmuch as in the indictment the object of the conspiracy charged is the illegal importation of 31 sacks of liquor, the court should have received, and the jury should have considered, only such evidence as was directly relevant to the 31 sacks; Terry v. United States (C. C. A.) 7 F.(2d) 28, being confidently relied upon as supporting this position. But in that case, under an indictment charging a single conspiracy, testimony was received relating to two distinct enterprises or conspiracies, one at Bodega Bay by one group of defendants, and one at Allen's wharf by another group. Said the court:

"Here we find no testimony tending to show any general conspiracy covering and including both the incident at Allen's wharf and the incident at Bodega Bay. On the other hand, every inference from the testimony is to the contrary. There is no testimony tending to show that the parties assembled at Allen's wharf were parties to a conspiracy to transport, possess, or sell intoxicating liquor at Bodega Bay, six weeks before, or that they had any knowledge whatever of that transaction."

But here it appears that the 31 sacks were but a part of a single load of 200 cases, and that the 200 cases were but a part of 10,000 or 15,000 cases, constituting the cargo of the Marion Douglas. That there was on foot a conspiracy illegally to bring into the United States this entire cargo the evidence leaves no room for question. Undoubtedly the government might have urged a conspiracy of broader scope and wider purpose, but it was not bound to do so. Had the charge been comprehensive enough in terms to include the voyage of the Marion Douglas, it might later have developed that, after all, such voyage was but one feature of a more gigantic conspiracy of long standing.

The evidence tends to, if, indeed, it does not compel, the conclusion that the last trip of the speed boat Jackie was only an incident of a more comprehensive conspiracy, the object of which was at least the landing in the United States of the entire cargo of the Marion Douglas, and hence such transaction did not constitute a separate conspiracy, but was an integral part of the larger enterprise to which the challenged evidence relates. That being true, the government had the right to prove the whole scope, for proof of the whole covered also the part specifically referred to in the indictment. The fact that only one end of the rope was visible to the grand jury did not operate to exclude at the trial proof that appellant also had hold of the other. Appellant is protected against future prosecution for the general conspiracy, or any other branch of it, for doubtless the judgment in this case could be successfully pleaded as a bar to any other charge relating thereto.

Affirmed.